UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Mirsada I.,                                    )
                                               )
            Plaintiff,                         )
                                               )
v.                                             )        No. 19 CV 50097
                                               )        Magistrate Judge Iain D. Johnston
Andrew Saul,                                   )
Commissioner of Social Security,               )
                                               )
            Defendant.                         )


**MEMORANDUM OPINION AND ORDER**

        Plaintiff has been seeking Social Security disability benefits for over a decade and in fact

did receive them for a time, from 2008 to 2012.[1] Her present application was filed in February

2016. She has had a back impairment and a few other physical problems. When she first filed for

benefits many years ago, it was thought that her impairments were only physical. At one time,

plaintiff was diagnosed with fibromyalgia, but her doctors now seem to believe that her

impairments are mostly psychological. She has been diagnosed with and currently suffers from

anxiety, depression, and post-traumatic stress syndrome ("PTSD"). The latter condition is

connected to traumatic experiences while living through the Bosnian war in the 1990s.[2]

---

[1] The parties do not summarize this long administrative history or rely on it for their current arguments, and this Court likewise will not recount this history. But it is worth noting that it is extensive. Plaintiff filed a Title II application in January 2009. R. 113. It is not known whether this was her first application. But since then, there have been several applications filed over the years; four administrative hearings; numerous opinions issued by experts and consultants; three decisions issued by the current ALJ (two against plaintiff and one in her favor); and one decision by this Court in 2014 remanding this case for additional proceedings because the ALJ failed to follow the treating physician rule. *See Mirsada I. v. Colvin*, Case No. 12 C 50078, Dkt. #37.
[2] Plaintiff described these experiences at a prior hearing. *See* R. 86-87. She and her family were forced to move from village to village. She saw property destroyed and people killed from bombings. Her brother died during the war. Plaintiff and her family eventually fled to Germany and then moved to the United States in 1999.

In October 2017, an administrative law judge ("ALJ") held a hearing. Dr. Michael Rabin testified as the impartial medical expert. He made two main points. First, he opined that plaintiff could do light work subject to certain RFC restrictions (*e.g.* simple repetitive tasks) designed to address her psychological impairments, which included problems concentrating and interacting with people. Second, he criticized a medical opinion (Ex. 23F) submitted by Dr. Syed Irfan, who had been treating plaintiff for several years or more. Most pertinent to this appeal, Dr. Irfan predicted that plaintiff would miss five days or more a month and would be off task 30% or more of the work day. R. 1232. These two assertions are the focus of this appeal.

On March 15, 2018, the ALJ found plaintiff not disabled. The ALJ relied heavily on Dr. Rabin's opinion and mostly rejected Dr. Irfan's opinion. The ALJ also referred to the opinions from the State Agency physicians and a report from consultative examiner Mark Langgut, giving them partial weight. However, the main part of the decision was the choice to credit Dr. Rabin over Dr. Irfan.

Plaintiff raises three arguments for a remand. She first argues that the ALJ failed to properly apply the treating physician rule in rejecting Dr. Irfan's opinion. She next argues that the ALJ erred in relying on the testimony of Dr. Rabin. These first two arguments are closely connected in that Dr. Rabin and Dr. Irfan are essentially on a zero-sum seesaw. If one is up, the other is down. The third argument criticizes the credibility analysis and in particular the rationales about plaintiff's daily activities and ability to work part time.[3]

After reading through the briefs, the Court finds that the second argument stands out and deserves to be addressed first because plaintiff is making a very strong accusation. She asserts that the testimony of Dr. Rabin, the key witness, was "fundamentally flawed" from start to

---

[3] After the onset date, plaintiff worked a couple of days a week in the dining service of a nursing home. R. 53.

finish. Dkt. #17 at 7. Plaintiff does not use this phrase lightly. She contends that the doctor made "gross misstatements" that "called into question the accuracy of the rest of his testimony." *Id.* at 8. In her reply brief, she goes so far as to suggest that Dr. Rabin did not make a "single wholly accurate statement" in his testimony. *See* Dkt. #28 at 4.

Perhaps plaintiff overstates the argument somewhat, but not by much. After reviewing the testimony, the Court agrees that there are simply too many erroneous statements. The Court will go through this testimony in detail and explain the various problems. In fact, the entire testimony (it is just over six pages in the 32-page transcript) will be quoted. But it will be broken into four parts to allow for analysis along the way.

One preliminary point should be noted. Plaintiff complains that the testimony and cross-examination of the doctor was "severely hampered by numerous audio interferences which necessitated repetitions of questions and even extensive summarization of Plaintiff's testimony because Dr. Rabin had apparently heard almost none of it." Dkt. #17 at 8. This problem will be self-evident upon reading the excerpts below. Given that the testimony was not especially long to begin with, it would be even shorter if these repetitions were stripped out. And if the misstatements discussed below were also removed, there would be very little substance left over. This is another way of saying that the testimony is insufficient.

**Part 1.** Set forth below is the first portion of the testimony, which could serve as a cautionary tale about the importance of a witness making a good first impression:

ALJ: Doctor, would you state your name?

ME: Michael Ravin. R-A-V-I-N.[4]

ALJ: Counsel, do you have any objections to the doctor's qualifications?

---

[4] This is an error in the transcript. Everyone agrees that it is Dr. Rabin, not Dr. Ravin.

ATTY:  No.

ALJ:  Doctor, would you outline the claimant's impairments?

ME:  Yes, sir. Diagnosed with a persistent depressive disorder with major depressive episodes, post traumatic stress disorder, generalized anxiety disorder, and cannabis use.

ATTY:  Cannabis. That's got to be wrong, judge.

ALJ:  Where is at the—

ME:  Cannabis. She said both with her boy. Smokes three joints a day. Let me find where that is. And Your Honor, sorry. I got it mixed up with the next case.

ALJ:  All right. []

Q [by the ALJ]  So does she meet a listing or how do you rate her on the B criteria?

A  Okay. The B criteria. Understand [INAUDIBLE], it is mild. Interact with others—it is not severe. Concentration, it is moderate. This is a current. Limitations would be no general public. Only occasional contact with supervisors and coworkers, no team work tasks.

Q  Does she meet the C criteria?

A  No, sir.

ALJ:  Counsel, do you have any questions?

ATTY:  Well, yeah. I'm going to need some more explanation from the doctor just to make sure he's not mixing this up with another case.

ALJ:  Okay. Go ahead.

R. 64-65. There is no dispute that Dr. Rabin confused the files from two disability

claimants, causing him to make the incorrect statement that plaintiff was smoking three

joints a day. The only question is how to evaluate this mistake. Was it merely a trivial

mistake or a harbinger of deeper problems? Later during the hearing, the ALJ stated that

the mistake had been promptly "corrected," implying that it was no longer a matter of

concern. The ALJ seemed to believe that it was a harmless slip of tongue.[5] Plaintiff, on the other hand, is not so confident. She is concerned that the doctor may have gotten other facts wrong or may have been biased in some hard-to-measure way. Plaintiff does not suggest that this one mistake by itself is dispositive, but she does assert that it should increase the skepticism when assessing the doctor's opinion. This is a fair point. Credibility is usually built (or lost) brick by brick.

**Part 2.** In the next portion of the testimony, Dr. Rabin offers the first criticism of Dr. Irfan's opinion, specifically the off-task provision. Here is this testimony:

Q [By plaintiff's counsel]  So doctor, what are you relying on to say that she only has—was it moderate limits in concentration?

A   Yes. Her memory, her attention, concentration are all good and adequate in all these mental tasks. And would give the mental source summary, mental source statement in 23-F. It indicated that she only has moderate limitations in understanding and concentrating on activity and moderate for the other ones.

Q  So didn't he also say that she'd likely to be missing work five days or more a month? Did you see that there at the end?

A   I'm sorry. I didn't catch that, yes.

Q   Okay. Didn't Dr. Irfan say she should likely miss work and/or be off task? Did you see that portion?

A  I'm not catching what you are saying. I'm so sorry.

ALJ:  She's asking you about. She's asking you didn't Dr. Irfan say she'd likely to miss four or five days a week.

ATTY:  I think that was it. Yes.

ME:  Yes. He also said she'd be off task 80 percent of the time, which makes no sense. If you look specifically at the B  criteria he provided in the same statement or it could be on the mental task evaluations. There is nothing in the record which supports that, so I don't understand why he says that.

---

[5] The ALJ did not mention this issue in the written decision.

R. 66.

Plaintiff argues that Dr. Rabin wrongly stated that Dr. Irfan had opined that plaintiff would be off task 80% of the workday when in fact Dr. Irfan only stated that plaintiff would be off task "30% or more" of the workday. The Government does not dispute that Dr. Rabin got this fact wrong.[6] The difference between 80% and 30% is significant. Dr. Rabin asserted that the 80% figure "makes no sense." Essentially he thought the figure was simply too high on its face in light of evidence suggesting that plaintiff's attention problems were mild. This one high number was a key reason why Dr. Rabin found Dr. Irfan not credible. But this entire line of argument collapses given that its factual premise is incorrect. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not rely on "errors of fact or logic"); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ "misstated some important evidence and misunderstood the import of other evidence"). Plaintiff reasonably asks the obvious question: Would Dr. Rabin's opinion have been the same if he believed that the figure were 30% rather than 80%?

Also, one can't help but wonder why Dr. Rabin came up with the specific figure of 80%. It seems to have come out of the blue with no obvious evidentiary jumping off point. Neither side offered any explanations. Perhaps the answer is simply that it was a mistake made when reading Dr. Irfan's opinion. Maybe it was somehow related to the mix up of the two files. Whatever the reason, this mistake adds to the growing unease about the doctor's testimony.

**Part 3.** This portion of the testimony introduces several new rationales into the discussion. It states as follows:

---

[6] There is potentially a small bit of wiggle room in the phrase "30% *or more*." One could argue that Dr. Rabin's statement was not strictly inconsistent as a logical matter because 80% is more than 30%. But the Government does not make any such argument and, as noted above, concedes that Dr. Rabin erred on this point.

ATTY:  Can you ask him, judge, to explain what he means by nothing in the record to support that?

ME:  What was that now?

ALJ:  Well she asked if—your question is what do you mean by there is nothing in the records to support that?

ME:  To support what?

ALJ:  Well, you said there is nothing in the record to support that?

BY THE JUDGE:

Q   It's what did you mean by that?

A   I'm sorry. Well, there is a reference to it. I mean, we talked about what event just now?

Q   Okay. There is no question. It was about him saying there—she would miss five days a month.

A   Okay. Yes. there is nothing in the record to support she would be off task 80 percent of the time or miss five days a month. She missed her appointments. That's one of the complaints, of her missing appointments, and so there is no indication she is likely to miss that much. In terms of attention and concentration she was adequate according to Dr. Irfan. I note he says—he marked down she was off task 80 percent of the time and that she would miss five days a week. But that would not explain—you mentioned earlier the conversion disorder. He diagnosed her in January of this year with a conversion disorder. He diagnosed her in January of this year with a conversion disorder and then it was there. It doesn't appear there, it [hasn't] disappeared and it is no longer mentioned. So I can't tell you that because there [are] no details about that and because it was mentioned I think two or three times and not mentioned anymore. He didn't explain why he put it there or why he took it out.

R. 66-68.

The two new topics raised in this excerpt are missing appointments and the conversion disorder diagnosis. Starting with the topic of missing appointments, plaintiff complains that the testimony was vague and unsupported. The ALJ apparently did not find the testimony vague because he relied on it to reach the straightforward conclusion plaintiff "did *not* miss her

appointments."[7] R. 30 (emphasis added). But as plaintiff points out, Dr. Rabin at one point appeared to be asserting *just the opposite*. *See* R. 68 (Dr. Rabin: "She missed her appointments."). But reading his testimony as a whole, it is possible that the transcript was garbled and that he was, in fact, making the point the ALJ believed he was making. But even if we make this assumption, this leads to the next question, which is whether it is factually correct. Plaintiff argues that it is not. *See* Dkt. #17 at 8 ("Multiple times Dr. Irfan makes a point to note that Plaintiff did not follow up in a month's time as she was supposed to (R. 548, 637, 653, 657, 768, 1165).")). The Government does not respond to this evidence and merely reiterates the ALJ's original unsupported claim that plaintiff never missed any doctor appointments. Dkt. #22 at 7. The upshot is that this whole topic is muddy, to say the least.

Turning next to the conversion disorder diagnosis, plaintiff argues again that Dr. Rabin got critical facts wrong. The gist of Dr. Rabin's testimony is that Dr. Irfan diagnosed plaintiff with conversion disorder in January 2017 and then basically lost focus and stopped mentioning it after a few more times. Dr. Rabin believed that Dr. Irfan should have offered a better explanation for this ostensible inconsistency.

The Court agrees with plaintiff that this analysis is based on a skewed factual picture. The main error is the claim that Dr. Irfan stop mentioning this diagnosis. The most recent treatment notes in the record from Dr. Irfan state as follows: "Conversation disorder symptoms with numbness *still* happening." R. 1278 (September 2017 visit) (emphasis added).[8] Given that Dr.

---

[7] This fact was offered to support the inference that if plaintiff were able to consistently show up for doctor appointments, she could also consistently show up for work. Counter-arguments could be raised about this inference. A person who was suffering from symptoms might be more willing to fight through the difficulties to see a doctor on the hope that the doctor might relieve those symptoms. Also, a doctor's visit is typically much shorter than a full 8-hour workday. But these arguments do not come into play yet because we are still wrestling with the lower order fact question of whether plaintiff actually missed appointments.

[8] The conversion disorder was offered to explain plaintiff's complaints of numbness. At the 2015 hearing, the medical expert (Dr. Semerdjian) made a similar point, although the discussion centered around the concept of a

Irfan did not stop mentioning this diagnosis, as Dr. Rabin wrongly claimed, then there is no reason to criticize him for not providing an explanation. Here again, Dr. Rabin did not review the record closely. This adds to the expanding pile of reasons why a remand is needed.

Part 4. The last portion of his testimony addresses plaintiff's nightmares and her PTSD diagnosis. There is also a brief statement about her depression. This excerpt is the longest of the four and states as follows:

> ATTY: Judge, can you ask him to explain how he evaluated her ongoing hallucinations and nightmares.
>
> ME: He said that her PTSD has been reduced. It is not as severe as it was and the only symptom now is the nightmares. But she is not having other PTSD symptoms. He also says that her depression is in remission.
>
> ATTY: Does she see him fairly often for treatment?
>
> ME: What, what's that?
>
> ALJ: She asked whether you—Dr. Irfan saw them often.
>
> ME: Dr. Irfan did what for treatment?
>
> ALJ: Saw him fairly often.
>
> ME: What is fairly often? I mean he saw her at—every couple of months.
>
> ALJ: Okay.
>
> ME: Approximately—it was every month for awhile, so—
>
> ATTY: So to the extent that there is some stability here, couldn't that be attributable to her ongoing treatment with him?
>
> ME: I'm going to have to pass this, Your Honor. I have no—I mean, she said that she was [INAUDIBLE].
>
> ALJ: Okay. Say that again.

---

somatic symptom disorder rather than conversion disorder. *See* R. 100 "I think [] a lot of the physical findings [are] probably [] related to the psychological issues.").

ATTY: To the extent that there is some stability here could that be attributing to her ongoing regular treatments with him?

ALJ: She says to the extent that there is stability could that be attributed to his ongoing treatment?

ME: If there's a disability related to that ongoing treatment?

ALJ: No. To the extent that there is some stability could that be related to his ongoing treatment. Is that a fair—

ATTY: Yes.

ALJ: —characterization of your question?

ATTY; Yes, judge.

ALJ: Okay.

ME: Yes. That is frequent and taking medications. It is a part of her stability. She was in treatment of medications. She's been—she may decompensate. But for anybody who is on medications—

ALJ: All right. I guess what she is aiming at is the C criteria. Is that not the case?

ATTY: You're right.

ALJ: Okay. So you just said she might decompensate if she's not under treatment.

ME: Yes, I did. Yes. So that's not the C criteria. If you look—in treatments she's referred well. Her doctor said that she was more persistent, not under depression, the anxiety is less and the PTSD is down to only occasional nightmares.

ATTY: Where does he [say] occasional nightmares only?

ALJ: She said—the question is where are you seeing that there is only occasional nightmares?

ME: Probably—well, I will [INAUDIBLE]. He said that she is better in 22-F. At seven, 22-F. States that she—that she was better, was improved.

ALJ: Okay. Where did it say? And I'll just remind you, your original testimony—your earlier was that the PTSD was—reduced the nightmares.

ME:   Yes. It was reduced to all, to all these occasional. I know that I recognize—I had a problem with this, judge, in my notes.

ALJ:  Counsel, anything else?

ATTY:  I—no, judge. I don't have anything further for him. I just would like to note—I mean, he's possibly got into—you know, a very important fact wrong at this point about this case.

ALJ:  Okay. And which are those?

ATTY:  Well, occasional nightmares. I didn't see anything in the file that said that specific word and then he also said that she had cannabis disorder which is, you know, incorrect.

ALJ:  Okay. Well, that's been corrected.

ME:  What was that?

ALJ:  Well, she pointed out two errors. One is she says there is nothing—there is no reference to occasional nightmares. Then she pointed out that cannabis. You know, I just pointed out that we corrected that error. Okay, so that's—

ME:  Correct.

ALJ:  All right. So anything else?

ATTY:  No thanks.

R. 68-71.

Plaintiff argues that Dr. Rabin got several things wrong here. The main complaint is about the factual claim that she was "down to only occasional nightmares." At the hearing, plaintiff's counsel doubted this testimony on the spot and challenged Dr. Rabin to provide proof. After some hesitation, Dr. Rabin came up with one citation, which was to Exhibit 22F at page 7. The issue was not pursued further at the hearing. But plaintiff now has had time to check the source and it turns out that it says nothing about nightmares or PTSD.[9] The Government agrees the citation was wrong.

_____

[9] The cited page summarizes gynecological tests, and two nurses are listed as the treatment providers.

The Government tries to remedy the problem by coming up with two citations to justify the point Dr. Rabin was making. *See* R. 549 (June 2016—PTSD symptoms "mostly in remission"); R. 637 (May 2017—PTSD symptoms "in partial remission"). It should be first noted that neither citation specifically states that the nightmares were occasional. But still, one could draw such an inference from the more general fact that the PTSD symptoms, during these two visits, were in remission to some degree. But the more substantive problem, aside from the fact that Dr. Rabin himself never cited to these notes, is that they do not substantiate the core allegation implied by Dr. Rabin's testimony. He testified specifically that plaintiff was "down to only occasional nightmares." The clear implication is that there was some kind of a permanent and stable improvement and that these nightmares were currently (*i.e.* at the time of the hearing) only occurring occasionally. But this assertion is not supported by the record. Again, Dr. Irfan's last treatment notes before the hearing provide a direct rebuttal. *See* R. 1165 (July 2017: "PTSD symptoms appear to be the same *with bad dreams ongoing*") (emphasis added); R. 1278 (Sept. 2017—"PTSD symptoms appear to be the same"); *see also* R. 1357 (in December 2017, plaintiff told Dr. Langgut she was still having nightmares). The problem with the Government's reliance on the two earlier treatment notes is that they are equally consistent with plaintiff's claim that her PTSD symptoms were waxing and waning, with good days and bad days.

Similar criticisms can be directed at Dr. Rabin's statement that plaintiff's depression was in remission. R. 68. As with the PTSD, one can find instances where Dr. Irfan noted that the depression symptoms had lessened at various points. But there is no evidence to support the claim that there was some type of permanent improvement, one that was evident at the time of the hearing. Dr. Irfan's notes from the last two visits again provide the critical evidence. *See* R. 1277 ( "Major depressive disorder, currently severe"); R. 1165 ("Major depression appears to be

worse. Increase in Wellbutrin has not helped."). It might be one thing to argue, as the Government partially tries to do, that the symptoms, although oscillating, were on balance more consistently mild than severe. But this is not an argument that Dr. Rabin explicitly made. More broadly, plaintiff was taking numerous medications for all her psychological conditions, and Dr. Irfan had been changing and adjusting them repeatedly, which is further evidence that he believed plaintiff's problems were still fairly severe and not entirely stable.

To sum up, the Court finds that the above errors and misstatements cumulatively cast doubt on the doctor's entire testimony. These problems are too pervasive to be fixed through a harmless error approach. To be clear, the ALJ made no effort to explain these errors. In fact, in the written decision, he never directly acknowledged that Dr. Rabin's testimony was flawed *in any respect*. He did *implicitly* recognize that the 80% figure was wrong because he later substituted in the correct 30% figure. But he did so silently. Rather than acknowledging these mistakes, he essentially doubled down and declared that Dr. Rabin's testimony was worthy of "heavy" weight. He relied on this testimony to discredit the opinion of plaintiff's treating physician. There was some other evidence, such as the reports from the State Agency physicians and Dr. Langgut, but this evidence played a minor role in the decision. In short, the ALJ's decision was built on Dr. Rabin's testimony.

For all these reasons, the Court finds that this testimony was too flawed to be relied on in any fashion, must less be given "heavy" weight. This error is sufficient by itself to remand the case.

Having concluded that a remand is required, the Court will not address the remaining arguments, in part because they will all have to be reconsidered on remand. But the Court acknowledges that there are other disputed issues raised in the briefs. Plaintiff has raised valid

concerns about whether the ALJ gave too much weight to the fact that she was working two times a week in a part-time job. The Government argues that the ALJ validly concluded that the objective evidence (mainly the mental status examinations) was inconsistent with Dr. Irfan's supposedly more extreme conclusions. This is certainly a valid topic to explore. But in doing so, the ALJ should provide a more fine-grained analysis with the assistance of a medical expert. For one thing, as discussed above, it is possible that some of the normal findings may be explained by the episodic nature of these impairments. There is also a concern about cherrypicking. Dr. Rabin referred several times to one of the three psychological impairments being in remission during a particular visit, but then failed to note that the other psychological impairments were not always in remission during that same visit. Another concern is with the important question of persistence. A person who can concentrate sufficiently to pass a brief memory test during an office visit may not be able to maintain this concentration over a longer work day. The ALJ never squarely addressed this possibility.

In remanding this case, the Court recognizes that plaintiff has been seeking benefits for many years and that this has been a long process for everyone concerned. The Court, however, concludes that the ALJ's present decision cannot be affirmed in light of the fundamental problems with the testimony of the key medical witness. The Court urges plaintiff's counsel and the ALJ to thoroughly explore all relevant issues at a new hearing on remand. If this case is appealed to this Court a third time, the Court may find that any arguments not explicitly raised at the administrative level are forfeited.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the

government's motion is denied, and this case is remanded for further consideration.

Date:  August 3, 2020                              By:  _____

                                                                              Iain D. Johnston
                                                                              United States Magistrate Judge